IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: ) | Case No. 10-82436 |
| ) | |
| PROFESSIONAL VETERINARY ) | |
| PRODUCTS, LTD, A NEBRASKA ) | Chapter 11 |
| CORPORATION, ) | |
| ) | |
| Debtor, ) | |
| In re: ) | Case No. 10-82437 |
| ) | |
| EXACT LOGISTICS, LLC, ) | |
| ) | CHAPTER 11 |
| Debtor, ) | |
| In re: ) | Case No. 10-82438 |
| ) | |
| PROCONN, LLC, ) | |
| ) | CHAPTER 11 |
| Debtor, ) | |

## AFFIDAVIT OF STEPHEN J. PRICE

STATE OF NEBRASKA   )
                    ) ss.
COUNTY OF DOUGLAS)

I, Stephen J. Price, being first duly sworn do hereby state as follows:

1. I am the president and chief executive officer of Professional Veterinary Products, LTD, a Nebraska corporation ("PVP") and have held this position since December 2008. I have been employed by PVP and its affiliates since 2002. I am responsible for managing the operations of this company and have personal knowledge of the facts set forth herein.

2. I submit this affidavit (the "Affidavit") in support of the Debtors' petitions and various contemporaneously-filed requests for relief in the form of "first-day" applications and

motions identified on Exhibit "A" annexed hereto (collectively, the "First Day Motions"),[1] as well as to assist the Court and other interested parties in understanding the circumstances that compelled the commencement of these chapter 11 cases. I have reviewed the First Day Motions and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses pending their orderly liquidation and the Debtors' efforts to maximize the value of their assets for the benefit of all stakeholders through this process. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, the Debtors' professionals, or employees of the Debtors working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors. I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I could and would testify competently to the facts set forth herein.

3. On August 20, 2010 (the "Petition Date"), Professional Veterinary Products, LTD ("PVP"), ProConn, LLC ("ProConn") and Exact Logistics, LLC ("Exact") (collectively referred to as the "Companies" or "Debtors") filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Following the Petition Date, the Debtors intend to continue in the possession of their properties and the management of their businesses as Debtors in Possession pursuant to § 1107 and 1108 of the Bankruptcy Code in order to orderly liquidate their existing assets.

4. No trustee, examiner, or committee of creditors has been appointed in this case.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the applicable First Day Papers.

5. The Debtors are a leading wholesale distributor of animal health products to veterinarians and their related businesses. The Debtors distribute to their customers approximately 20,000 different products including biologicals, pharmaceuticals, parasiticides, instruments and equipment and also offers industry-exclusive programs on inventory management. These products are sourced from more than 300 vendors with Pfizer, Inc. ("Pfizer") and Intervet/Schering-Plough as the top two vendors. Approximately 14,000 products are inventoried for immediate shipment and the remaining items are either drop-shipped from the manufacturer to the customer or are special order items. The Debtors do not manufacture any products and are dependant on vendors for their inventoried stock.

6. As of July 31, 2009, PVP had approximately 1,900 shareholders, all of whom were veterinarians or veterinary clinics. The shareholders are located throughout the United States. These shareholders also are the Debtors primary customers.

7. Certain of the Debtors current and future vendors are competing with Debtors by pursuing or increasing their efforts in direct marketing and sale of their products. These vendors can sell their products at lower prices and maintain a higher gross margin on their product sales than Debtors enjoy. Because of this veterinarians and animal owners are increasingly electing to purchase their animal health products directly from these vendors. Certain of the Debtors' vendors such as Pfizer have greatly reduced the profit margins available to the Debtors when selling these vendors' products, causing the Debtors' significant financial stress. In addition, certain of the Debtors' competitors enjoy access to more favorable capital markets which are not available to the Debtors.

8. On or about April 7, 2010, the Debtors' retained BGA Management, LLC d/b/a Alliance Management ("Alliance"), a Minneapolis based financial analyst and turnaround

3

consultant. Alliance was initially hired to assess the Debtors' financial and operational condition and to review its strategic options. Following the Debtors' CFO's resignation, Alliance's role was expanded to provide day to day financial advice to the Debtors.

9. The Debtors' Board instructed me as Debtors' CEO to attempt to market the company as a going concern to competitors if a viable alternative model could not be developed by Alliance. Alliance presented its report to the Board and following the Boards and Management's review, it was decided the Debtors' existing business model was no longer viable. At that point the Debtors' Board directed me to focus my efforts on marketing the Companies as a going concern.

10. Alliance then negotiated on behalf of the Debtors to obtain an extension of Debtors' credit agreement with Wells Fargo to allow Debtors time to market their business for sale.

11. In an effort to market the Companies as a going concern, I contacted Debtors' competitors to determine if there was an interest in a going concern purchase of the business beginning in June of this year. I contacted the following companies to attempt to structure a sale of the Debtors as a going concern between June and the Petition Date:

    (a) MWI Veterinary Supply

    (b) Ivesco, LLC

    (c) Thomas Agribusiness Advisors

    (d) Lextron, Inc.

    (e) Webster Veterinary

    (f) Animal Health International, Inc. ("AHI")

12. Despite these efforts only AHI was interested in pursuing a purchase of the Companies as a going concern. AHI, however, refused to consummate a purchase without the assignment of certain of Debtors' marketing agreements with Pfizer. Any assignment of these

contracts to AHI required Pfizer's consent. Pfizer refused to consent, terminating AHI's interest in a going concern purchase.

13. After AHI's exit as a going concern prospect and into August of 2010, I continued to pursue the sale of the Debtors either as a going concern or otherwise. During this time, AHI resurfaced and expressed interest in purchasing certain of the Companies' assets. On August 6, 2010, AHI delivered a non-binding term sheet offering to purchase up to eighteen million dollars ($18,000,000.00) of PVP's inventory at PVP's net landed cost, certain of PVP's equipment, software, intellectual property, intangible assets and related property described therein for PVP's current book value, and to assume PVP's leases of its York, Pennsylvania facility (the "AHI Purchase"). This purchase would essentially divest the Companies of all their operating assets. AHI also agreed to interview and consider hiring Debtors' employees as part of the AHI Purchase.

14. The AHI Purchase is conditioned on the Debtors selling those assets to AHI through an 11 U.S.C. § 363 sale and auction process.

15. On August 16, 2010, the Debtors entered into a second Professional Services Agreement with Alliance whereby Alliance has been retained to manage and direct any asset sale(s) by Debtors.

16. Debtors' major secured creditor is Wells Fargo Bank, National Association ("Wells Fargo"). Debtors entered into a Credit and Security Agreement dated January 29, 2010 (the "Credit Agreement") with Wells Fargo, which provided Debtors with access to a revolving credit facility to fund their operations. Wells Fargo claims a first priority security interest in substantially all of Debtors' assets including Debtors' cash collateral consisting of inventory, receivables and their proceeds and Debtors' hard assets including their plants, equipment and real estate under the Credit Agreement. In March of 2010, Debtors defaulted on their obligations to Wells Fargo under the

Credit Agreement, and ultimately entered into a forbearance agreement with Wells Fargo which is now also in default. Wells Fargo is no longer willing to finance Debtors as a going concern which has left the Debtors with no choice but to seek breathing room to orderly liquidate their businesses and assets by filing for Chapter 11 relief, to hold a 363 sale and to market and sell Debtors' remaining assets liquidating their operations.

17. Debtors' ability to sell their businesses to a purchaser following the 363 auction process is dependent on maintaining their operations as a going concern, and retaining their customer base until such sales can be closed. In addition to the 363 sale to the highest bidder, which Debtors seek to conclude on about September 10, 2010, the Debtors require at least thirteen (13) weeks to complete the sale and liquidation of any residual non-real estate assets to insure with the value of their assets is maximized.

18. As a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtors' executives, and discussions with the Debtors' outside advisors, I have formed opinions regarding (a) the necessity of obtaining the relief sought by the Debtors in their First Day Motions, (b) the deleterious effects upon the Debtors of not obtaining such relief and (c) the immediate and irreparable harm to which the Debtors will be exposed immediately following the Petition Date unless the relief requested in the First Day Motions is granted without delay.

19. I submit this Affidavit in support of the Petitions and First Day Motions filed with the Court in connection with the commencement of these cases.

20. I participated in preparing and have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information

and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

21.     I personally participated in the analysis that led to the creation of each of the First Day Motions and assisted in their drafting and development. At all times the Debtors' management and professionals remained cognizant of the limitations imposed on debtors in possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability to preserve their operations pending an orderly liquidation of their assets.

22.     I believe the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate effectively in chapter 11 as debtors in possession and maximize the value of their assets for the benefit of stakeholders.

23.     The relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met and the Debtors suffer no immediate and irreparable harm.

24.     With respect to the Debtors' Emergency Motion for Interim and Final Order Authorizing Debtors to Enter into Stipulation with Wells Fargo Bank, National Association to Incur Post-Petition Secured Indebtedness and Granting Security Interests and Priority (the "Financing Motion"), I believe that it is essential to the Debtors' efforts to preserve and maximize the value of their assets that the Debtors obtain such relief, and that the Debtors be authorized to enter into the Stipulation as defined in the Financing Motion.

25. With respect to the authority to use interim Cash Collateral between the Petition Date and a hearing on the Financing Motion, I believe that it is essential to the Debtors' efforts to preserve and maximize the value of their assets that the Debtors obtain such relief.

26. The Debtors require utility services continue to be provided without interruption. The utility services are required to maintain the light, power and energy necessary to operate their facilities and preserve their inventory, some of which requires climate controlled and refrigerated environments to remain saleable. The loss of utility service will lead to immediate and irreparable harm to the Debtors.

27. Similarly, the ability to continue to use their existing Cash Management System and Bank Accounts, as well as utilize their existing bank stock and business forms without necessity of additional references to "Debtors In Possession" or "DIP", and without the need for opening new accounts will save the Debtors both time and expenses thereby facilitating a prompt orderly liquidation process, and helping to maximize the value available to all stakeholders.

28. Prior to the Petition Date, the Debtors' day-to-day business operations were funded from cash receipts received from operations and from borrowings from Wells Fargo pursuant to the Credit Agreement. Wells Fargo asserts that the Debtors' obligations under the Credit Agreement are secured by perfected first priority liens and security interests in substantially all of the personal property and real estate of the Debtors, including cash collateral. The Debtors therefore do not have any unencumbered cash within which to operate their businesses. The Debtors have an immediate need for the use of cash collateral, without which the Debtors would be unable to operate their businesses. Although the use of cash collateral is necessary to the operation of the Debtors' businesses, the use of cash collateral alone is insufficient to fund the business operations because the Debtors' sales are such that their inventory is dwindling and it will require additional inventory to

continue in operation and preserve the value of their businesses pending the completion of the sale of their assets at auction. Accordingly, the Debtors also have an immediate need for the additional liquidity being provided pursuant to the Stipulation. Put differently, without the use of Cash Collateral and Post-Petition financing under the Stipulation, the Debtors will be unable to pay for services and expenses necessary to operate their businesses and preserve and maximize the value of their assets.

29. The Debtors, after extensive negotiations and weighing the costs, benefits and risks associated with the proposal, determined that the terms and conditions of the debtor in possession financing proposed by Wells Fargo under the Stipulation provides the best option for post-petition financing, and the best potential means of maximizing the value of their assets for the benefit of all stakeholders.

30. I believe that absent sufficient funds to support the Debtors' business operations, the value of the Debtors' assets will quickly deteriorate, their employees and customers will leave, and any purchaser's interest in purchasing the Debtors' assets will erode causing immediate and irreparable harm to the Debtors and their estates. As such, there is a real, immediate risk that if the Debtors are not authorized to use cash collateral and enter into the Stipulation as requested, as well as to continue to honor their pre-petition employee obligations in the ordinary course, the employees would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and harming the value of the Debtors' estates. Consequently, I strongly believe that it is critical that the Debtors be permitted to pay their employees their pre-petition wages and continue with their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.

31. Furthermore, I firmly believe that it is critical to the success of the § 363 sale and either the reorganization or liquidation of the Debtors that certain incentive agreements entered into with key employees be assumed by the Debtors and approved by the Court. A critical component of the sale of substantially all of the Debtors' assets is the Debtors' ability to keep its employees employed through the date of the sale. This is especially true of the Debtors' sales representatives. AHI has informed the Debtors that the value in the § 363 sale is through the Debtors' employees. Without the ability to offer employment to the Debtors' employees and/or purchase their employment in connection with the § 363 sale, any bidder is just purchasing inventory at cost. The value of the sale is through the employees' relationships with the Debtors' customers, especially those employees involved in sales. A loss of the Debtors' employees prior to the auction not only can adversely affect the purchase price the Debtors' assets are sold for, but can threaten the sale altogether.

32. In addition, the efforts of certain key employees is a vital factor in the success of either the reorganization or liquidation of the Debtors after the § 363 sale. The incentive agreements provide necessary incentives to the employees to reach certain benchmarks that will ultimately benefit the bankruptcy estate.

33. Based on my experience, the incentives offered in the incentive agreements are both fair and reasonable.

34. In order to avoid any disruption to the Debtors' customers which may arise as a result of the Debtors' chapter 11 filings, the Debtors have requested authority to honor the claims of certain Critical Vendors who supply certain shipping and packaging services to whom unpaid pre-petition amounts are owed. These Critical Vendors are instrumental in providing the containers and packaging needed for storage of raw materials and the shipment of the Debtors' finished products to

the Debtors' customers. These Critical Vendors may attempt to assert their various statutory rights against the Debtors' goods that are in transit with respect to their pre-petition claims, thereby causing massive disruption in the Debtors' supply chain and causing immediate and irreparable harm to the Debtors' and their estates.

35. Accordingly, the Debtors seek authority to pay (i) the claims of these Critical Vendors as more particularly described in the Motion for Order Authorizing Payments to Critical Vendors. Absent obtaining authorization to pay the claims of the Critical Vendors, the Debtors believe their businesses will be severely disrupted, resulting in immediate and irreparable harm to the Debtors' estates.

36. In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

FURTHER AFFIANT SAYETH NAUGHT.

                                                        /s/ *Stephen J. Price*
                                                        Stephen J. Price

SUBSCRIBED and sworn to before me this 20th day of August, 2010.

                                                        /s/ *Kimberly A. Bendon*
                                                        Notary Public

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2010, I caused filing of the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system, and further certify that on the same date I mailed by Federal Express Overnight delivery, this document to each of the individuals listed below:

Wells Fargo, National Association
C/O Christopher J. Fisher
Laurence M. Frazen
Trevor A. Jenkins
Bryan Cave LLP
1200 Main Street, Suite 3500
Kansas City, MO 64105

Nebraska Department of Revenue
Attn: Bankruptcy Unit
301 Centennial Mall South
Lincoln, NE 68509-4818

Internal Revenue Service
Fresno, CA  93888-0002

United States Trustee's Office
111 South 18th Plaza
Suite 1148
Omaha, NE 68102

Agri Laboratories Ltd
20927 State Route K
St Joseph, MO 64505-3570

Bayer Healthcare LLC
12809 Shawnee Mission Pkwy
Shawnee KS 66216-1846

Bimeda Animal Health Inc
Attn: Marianne Anderson
One Tower Lane Suite 2250
Oakbrook Terrace, IL 60181

Boehringer Ingelheim
Vetmedica
2621 N Belt Highway
St. Joseph, MO 64506-2002

Idexx Distribution Corporation
One IDEXX Drive
Westbrook, ME 04092

Intervet, Inc. / Schering Plough
556 Morris Ave
Summit, NJ 07901-1330

Jorgensen Laboratories Inc
Attn: Cindy Alexander
1450 N Van Buren Ave
Loveland, CO 80538

Kendall/Covidien
15 Hampshire St
Mansfield, MA 02048

Central Life Sciences / Vet Product Laboratories
1501 E. Woodfield Rd Suite 200W
Schaumburg, IL 60173

Lionel Reilly
20620 Corral Road
Elkhorn, NE 68022

Merial Limited
115 Trans Tech Drive
Athens, GA 30601

Norbrook Labs
9733 Loiret Blvd
Lenexa, KS 66219

Nutra-Blend LLC
3200 2nd Street
Neosho, MO 64850-7738

Ceva Animal Health, Inc.
465 Sovereign Ct.
St. Louis, MO 63011

Virbac Corp
3200 Meacham Boulevard
Fort Worth, TX 76137-4611

Fulton Bank
30 South George
York, PA 17401

First National Bank of Omaha
1620 Dodge Street
Omaha, NE 68103

Multimin USA, Inc.
2809 East Harmony Road, Suite 190
Fort Collins, CO 80528

Metropolitan Utility District
1723 Harney Street
Omaha, NE 68102

Omaha Public Power District
444 South 16th Street
Omaha, NE 68102-2247

Met Ed
76 South Main Street
A-RPC

Neogen Corporation
Attn: Greg Hardin
25154 Network Place
Chicago, IL 60673

Novartis Animal Health US Inc
10401 Highway 6
Lincoln, NE 68517

Pfizer, Inc.
812 Springdale Drive
Exton, PA 19341

Top Rx Inc
2950 Brother Boulevard
Memphis, TN 38133-3968

West-Ward Pharmaceutical Corp
3030 Lyndon B Johnson Freeway
Dallas, TX 75234-7781

Wells Fargo Bank
109 South 7th Street
Minneapolis, MN 55402

JP Morgan Chase Bank N.A.
270 Park Avenue
New York, NY 10017

Black Hills Energy
1815 Capitol Avenue
Omaha, NE 68102-4905

Columbia Gas of Pennsylvania
501 Technology Drive
Canonsburg, PA 45274-2510

AT&T
PO Box 1809
Paramus, NJ 07653-1809

13

Akron, OH 44308-1890

Cox
PO Box 94927
Lincoln, NE 68509-4927

KeyOn SpeedNet LLC
11742 Stonegate Circle
Omaha, NE 68164

MediaComm
1005 N Frederick Ste 6
Oelwein, IA 50662-1018

Qwest
PO Box 91154
Seattle, WA 98111-9254

Qwest
PO Box 52187
Phoenix, AZ 85072-2187

Sprint
KSOPHT0101-Z4300
6391 Sprint Parkway
Overland Park, KS 66251-4300

Sprint
KSOPHT0101-Z4300
6391 Sprint Parkway
Overland Park, KS 66251-4300

Verizon
777 Big Timber Road
Elgin, Il 60123

Verizon
777 Big Timber Road
Elgin, Il 60123

LightYear
1901 Eastpoint Parkway
Louisville, KY 40223

   /s/ *Robert J. Bothe*_____
Robert J. Bothe