IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) ) | Case No. 10-82436 |
| PROFESSIONAL VETERINARY PRODUCTS, LTD, A NEBRASKA CORPORATION, | ) ) ) ) ) | Chapter 11 |
| Debtor, | ) ) | |
| In re: | ) ) | Case No. 10-82437 |
| EXACT LOGISTICS, LLC, | ) ) ) | CHAPTER 11 |
| Debtor, | ) ) | |
| In re: | ) ) | Case No. 10-82438 |
| PROCONN, LLC, | ) ) ) | CHAPTER 11 |
| Debtor, | ) ) | |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL
ORDER AUTHORIZING DEBTORS TO ENTER INTO STIPULATION WITH WELLS
FARGO BANK, NATIONAL ASSOCIATION TO INCUR POST-PETITION SECURED
INDEBTEDNESS AND GRANTING SECURITY INTERESTS AND PRIORITY**

COME NOW Professional Veterinary Products, LTD ("PVP"); ProConn, LLC ("ProConn"); and, Exact Logistics, LLC ("Exact Logistics"), Debtors and Debtors in Possession (collectively the "Debtors" or sometimes the "Companies"), and move this Court for an order granting their Emergency Motion for Interim and Final Order Authorizing Debtors to Enter into Stipulation with Wells Fargo Bank, National Association to Incur Post-Petition Secured Indebtedness and Granting Security Interests and Priority (the "Motion") as provided in the Stipulation For Secured Borrowing And Adequate Protection (the "Stipulation")[1] in the form of

---

[1] All capitalized terms not otherwise defined herein shall have the meanings attributed to them in the Stipulation. If anything contained herein contradicts or is in conflict with the terms of the Stipulation, the terms of the Stipulation shall control.

the Stipulation submitted herewith as Exhibit "A" which incorporates the provisions of the Credit Agreement, a copy of which is submitted herewith as Exhibit "B". In support of the Motion, the Debtors state as follows:

## A. BACKGROUND FACTS

1. On August 20, 2010 (the "Petition Date"), the Debtors filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue in the possession of their properties and the management of their businesses as Debtors in Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. No trustee, examiner, or committee of creditors has been appointed in this case.

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).

4. The Debtors are a leading wholesale distributor of animal health products to veterinarians and their related businesses. The Debtors distribute to their customers approximately 20,000 different products including biologicals, pharmaceuticals, parasiticides, instruments and equipment and also offers industry-exclusive programs on inventory management. These products are sourced from more than 300 vendors with Pfizer, Inc. ("Pfizer") and Intervet/Schering-Plough as the top two vendors. Approximately 14,000 products are inventoried for immediate shipment and the remaining items are either drop-shipped from the manufacturer to the customer or are special order items. The Debtors do not manufacture any products and are dependant on vendors for their inventoried stock.

5. As of July 31, 2009, PVP had approximately 1,900 shareholders, all of whom were veterinarians or veterinary clinics. The shareholders are located throughout the United States. These shareholders also are the Debtors primary customers. PVP is the sole owner of the membership interests of ProConn and Exact Logistics.

6. Certain of the Debtors current and future vendors are competing with Debtors by pursuing or increasing their efforts in direct marketing and sale of their products. These vendors can sell their products at lower prices and maintain a higher gross margin on their product sales than Debtors enjoy. Because of this veterinarians and animal owners are increasingly electing to purchase their animal health products directly from these vendors. Certain of the Debtors' vendors such as Pfizer have greatly reduced the profit margins available to the Debtors when selling these vendors' products, causing the Debtors' significant financial stress. In addition, certain of the Debtors' competitors enjoy access to more favorable capital markets which are not available to the Debtors.

7. On or about April 7, 2010, the Debtors' retained BGA Management, LLC d/b/a Alliance Management ("Alliance"), a Minneapolis based financial analyst and turnaround consultant. Alliance was initially hired to assess the Debtors' financial and operational condition and to review its strategic options. Following the Debtors' CFO's resignation, Alliance's role was expanded to provide day to day financial advice to the Debtors.

8. The Debtors' Board instructed their President and CEO, Stephen J. Price, to attempt to market the company as a going concern to competitors if a viable alternative model could not be developed by Alliance. Alliance presented its report to the Board and following the Board's and Management's review, it was decided the Debtors' existing business model was no longer viable. At that point the Debtors' Board directed Mr. Price to focus his efforts on marketing the Companies as a going concern.

9. Alliance then negotiated on behalf of the Debtors to obtain an extension of Debtors' credit agreement with Wells Fargo to allow Debtors time to market their business for sale.

10. Mr. Price contacted Debtors' competitors to determine if there was an interest in a

going concern purchase of the business beginning in June of this year. Mr. Price contacted the following companies to attempt to structure a sale of the Debtors as a going concern between June and the Petition Date:

    (a)    MWI Veternary Supply

    (b)    Ivesco, LLC

    (c)    Thomas Agribusiness Advisors

    (d)    Lextron, Inc.

    (e)    Webster Veterinary

    (f)    American Health International, Inc. ("AHI")

11. Despite these efforts only AHI was interested in pursuing a purchase of the Companies as a going concern. AHI, however, refused to consummate a purchase without the assignment of certain of Debtors' marketing agreements with Pfizer. Any assignment of these contracts to AHI required Pfizer's consent. Pfizer refused to consent, terminating AHI's interest in a going concern purchase.

12. After AHI's exit as a going concern prospect and into August of 2010, Mr. Price continued to pursue the sale of the Debtors' businesses and assets either as a going concern or otherwise. During this time, AHI resurfaced and expressed interest in purchasing certain of the Companies' assets. On August 6, 2010, AHI delivered a non-binding term sheet offering to purchase up to eighteen million dollars ($18,000,000.00) of PVP's inventory at PVP's net landed cost, certain of PVP's equipment, software, intellectual property, intangible assets and related property described therein for PVP's current book value, and to assume PVP's leases of its York, Pennsylvania facility (the "AHI Purchase"). This purchase would essentially divest the Companies of all their operating assets. AHI also agreed to interview and consider hiring Debtors' employees as part of the AHI Purchase.

4

13. The AHI Purchase is conditioned on the Debtors' selling those assets to AHI through an 11 U.S.C. § 363 sale and auction process. Debtors continue to negotiate with AHI as a possible stalking horse bidder, and have filed a motion to conduct a § 363 auction on a prompt basis to maximize the value of their assets.

14. On August 20, 2010, the Debtors entered into a second Professional Services Agreement with Alliance whereby Alliance has been retained to manage and direct any asset sale(s) by Debtors.

15. Debtors' major secured creditor is Wells Fargo Bank, National Association ("Lender") which claims a first priority security interest in substantially all of Debtors' assets including Debtors' cash collateral consisting of inventory, receivables and their proceeds and Debtors' hard assets including their plants, equipment and real estate. In March of 2010, Debtors defaulted on their obligations to Lender, and ultimately entered into a forbearance agreement with Lender which is now also in default. Lender is no longer willing to finance Debtors as a going concern which has left the Debtors with no choice but to seek breathing room to orderly liquidate their businesses and assets by filing for Chapter 11 relief, to hold a § 363 sale with AHI as the stalking horse bidder and to market and sell Debtors' remaining assets liquidating their operations.

16. In addition, Bayer Corporation ("Bayer") and Multimin USA, Inc. ("Multimin") have asserted claims based upon consignment agreements with the Debtors. Both Bayer and Multimin were allowed to pick up their inventory pre-petition with Lender's consent. Bayer and Multimin continue to assert a security interest in certain receivables of the Debtors' generated by the sale of their allegedly consigned inventory. As of the Petition Date, Bayer was owed approximately $200,000.00 and Multimin was owed approximately $39,263.00 by the Debtors. Lender, Bayer and Multimin will sometimes hereinafter be collectively referred to as the

"Secured Parties".

17. As attested to by Alex G. Smith of Alliance as of August 19, 2010, the Debtors owned inventory valued at $12,561,066, accounts receivable of $17,168,188, and Debtors real property and improvements with an estimated book value of $7,000,000. These assets are pledged as collateral to Lender giving it collateral with a total value of $36,729,254. As of the August 19, 2010, the Lender was owed approximately $8,454,032.

18. Debtors through Alliance have prepared a ten (10) week budget ("Budget") to allow for the orderly sale of their operating assets to AHI or another buyer through § 363 sale, and to allow time to complete the sale of their other non-real estate assets. A sale to AHI or other higher bidder will allow the Debtors to liquidate a major portion of their assets for their highest and best value as well as provide the opportunity at least through AHI's initial proposal to obtain substitute employment for their employees. The additional time in the budget will allow the Debtors an opportunity to market their remaining non-real estate assets in orderly fashion in an attempt to maximize their value.

19. Under Debtors' Budget, Debtors estimate they will need cash of $7,654,874 to operate during the ten (10) week period which is the estimated time it will take Debtors to consummate the auction process and thereafter to allow them to liquidate their other assets for their maximum value. Debtors also estimate it will collect $29,766,691 through new sales during this period, resulting in net cash needs of $22,111,817, Even after deduction of these net cash disbursements, the Secured Parties enjoy a substantial equity cushion of at least $14,000,000 to adequately protect their interests, and there is a substantial potential dividend projected to unsecured creditors.

20. Debtors' ability to sell their businesses to AHI or another purchaser following the §

363 auction process is dependent on maintaining their operations as a going concern, and retaining their customer base and employees until such sales can be closed. In addition to the § 363 sale to AHI or a higher bidder, which is estimated to be completed by September 15, 2010, the Debtors require a total of at least ten (10) weeks from the Petition Date to complete the sale and liquidation of their other non-real estate assets to insure the value of those assets is maximized.

21. Debtors have determined, in their business judgment that they have an insufficient amount of available cash, even if they were permitted to use the Secured Parties' Cash Collateral, to finance their operations post-petition without an additional financing facility pending closing of a sale of a substantial portion of their assets through the § 363 auction process. Further, without a sufficient financing facility, Debtors will find it difficult to (i) pay wages, salaries and operating expenses, (ii) fulfill existing obligations, or (iii) preserve the value of their assets pending an orderly liquidation successfully. A sufficient financing facility is needed immediately to preserve the value of Debtors' assets, and to maximize the overall return to the Debtors' stakeholders.

22. Despite extensive efforts, Debtors have not succeeded in obtaining sufficient unsecured credit to continue operations at present levels. Debtors' trade creditors currently have Debtors on COD for all purchases. After negotiating with Lender these parties and upon assessment of the proposed loan amounts and borrowing terms, including availability, interest rate, covenants and other business and financial provisions under the Stipulation, Debtors determined in their business judgment that Lender's proposed debtor in possession financing under the Stipulation offered the best available combination of terms and pricing for the post-petition financing needed to allow Debtors a reasonable time to liquidate their assets in an orderly manner for the best available recovery.

### B. DEBTORS' PRE-PETITION INDEBTEDNESS

23. The amount, nature and extent of the Debtors' Pre-Petition Indebtedness and Pre-

Petition Collateral is described in detail in the Stipulation which description is incorporated herein by this reference. In summary, Lender entered into the Exhibit "B" Credit and Security Agreement with the Debtors dated January 29, 2010, which provided up to a $40,000,000.00 revolving line of credit tied to a borrowing base (with the ancillary agreements thereto hereinafter referred to collectively as the "Credit Agreement").

24. As noted above, Lender was owed $8,454,032 under the Credit Agreement as of the Petition Date.

25. Pursuant to the Credit Agreement, the Debtors granted Lender a first priority lien and security interest in the Pre-Petition Collateral consisting of substantially all of the Debtors' material assets and properties and described in the Credit Agreement (the "Pre-Petition Collateral") including, without limitation, inventory, accounts receivable, equipment, general intangibles, and other tangible and intangible personal property and the proceeds thereof (the "Pre-Petition Liens"). In addition, substantially all of the Debtors' cash as of the Petition Date constitutes proceeds of the Pre-Petition Collateral and, therefore, is cash collateral of Lender within the meaning of 11 U.S.C. § 363(a) of the Bankruptcy Code (the "Cash Collateral").

26. Lender asserts their pre-petition liens and security interests have priority over all other security interests, if any, in the Pre-Petition Collateral, and these liens and security interests are valid, binding, properly perfected, unavoidable and enforceable against the estates of the Debtors. Further, the Debtors believe and have represented that the value of the Pre-Petition Collateral securing the Pre-Petition Indebtedness is greater than the aggregate amount of the Pre-Petition Indebtedness.

### C. DEBTORS' EFFORTS TO OBTAIN POST-PETITION CREDIT

27. The Debtors are unable, pursuant to Sections 364(a) or (b) of the Bankruptcy Code, to obtain sufficient unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as

an administrative expense. In fact, the Debtors have been on a COD basis for inventory purchases for several weeks prior to filing this case. Furthermore, the Debtors are unable to: (i) obtain sufficient unsecured credit with priority over all administrative expenses of the kind specified in Section 503(b) or 507(b) as authorized by Section 364(c)(1); (ii) obtain sufficient credit secured by only a lien on property of the estate which is otherwise unencumbered as authorized by Section 364(c)(2); or (iii) obtain sufficient credit secured only by a junior lien on property of the estate subject to an existing lien as authorized by Section 364(c)(3). Furthermore, the Debtors reasonably believe they would be unable to obtain sufficient credit on terms more favorable than offered by Lender for the interim period between filing and an auction of a substantial portion of their assets under the proposed § 363 auction procedures.

28. The Debtors must continue the operations of their businesses after the Petition Date or their ability to consummate § 363 auction and sale will be jeopardized and the value of their assets eroded. Any interruption of their cash flow, even on a temporary basis, would severely and irreparably harm their operations. The Debtors must have financing to continue to purchase goods, and to pay employees, rent, utility and other operational expenses. Due to a lack of credit terms from vendors recently, and the resulting need to buy all inventory COD, the Debtors' cash position is such that, without an immediate injection of additional capital, the Debtors cannot meet operating expenses. Termination of Debtors' operations would threaten the Debtors' liquidation efforts and injure all of Debtors' creditors, both unsecured and secured, and could cost over 200 employees of the Debtors their jobs and chances for employment by a subsequent purchaser. Furthermore, a substantial part of the value of the Debtors' existing businesses is their customer base and sales staff, without adequate funding to supply this base and have this sales staff pending a sale, the value of the Debtors' businesses would significantly deteriorate.

29. Debtors anticipate that approval of the Stipulation with the Lender, which is critical to the continuation of their operation and liquidation efforts, will result in the maximization of value of their assets through the proposed § 363 sale and auction process.

### D. THE POST-PETITION FINANCING

30. The Stipulation provides for a post-petition senior secured revolving credit facility based on a borrowing base calculation as provided in the Stipulation. The proceeds of this DIP Facility will be available for working capital including COD inventory purchases as allowed under the Borrowing Base, and revolving loans will be advanced as proceeds of cash collateral is applied to repay revolving loans. The Stipulation incorporates the terms of the Credit Agreement and contains the terms of DIP Facility. A copy of the Credit Agreement is attached hereto as Exhibit "B" and incorporated herein by this reference. The obligations owed to Lender under the Stipulation shall be referred to herein as the "Post-Petition Obligations".

31. Pursuant to 11 U.S.C. §§ 364(c) and 364(d), Debtors will grant to Lender, to secure the DIP Facility and the Post-Petition Obligations liens upon and security interests in the Lender's Collateral which is essentially all property and interests in property of Debtors' estates. The security interests and liens granted in favor of Lender in Lender's Collateral as security for the obligations under the DIP Facility shall constitute valid and perfected first-priority security interests in and liens upon all the Lender's Collateral, superior to and with priority overall other security interests and liens whether consensual or non-consensual, statutory or otherwise, and whether existing now or in the future, except as to the Carve Out (as defined in the Stipulation).

32. As adequate protection to the consignors the Debtors request that the pre-petition perfected security interests, if any, of Bayer and Multimin be preserved and retain the same priority and effect, if any, that they held as of the Petition Date, subject only to the liens of Lender and the Lender's Collateral.

33. The Lender's lien and security interests securing the Post-Petition Indebtedness shall have priority under the provisions of Section 364(c)(1) of the Bankruptcy Code over all administrative expenses incurred in the Debtors' Chapter 11 Cases including but not limited to the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 507(b) or 546(c) of the Bankruptcy Code and, if any such Chapter 11 Cases are converted to Chapter 7 cases, and shall at all times be senior to the rights of the Debtors in such Chapter 11 Cases or in such Chapter 7 cases, under the Code and shall have priority over any and all priority claims and expenses in any Chapter 11 Case or any such Chapter 7 case, whether incurred or arising prior or subsequent to the entry of the order approving this Motion. Except as expressly provided in the Stipulation, no claims shall be prior to or on a parity with the claims of the Lender against the Debtors.

34. The Stipulation provides a Carve Out of up to $250,000.00 for United States Trustee and Professional fees in addition to those parties rights under the Bankruptcy Code, including professionals retained by any Official Creditor's Committee appointed by the United States Trustee, provided no funds advanced by Lender may be used to invalidate, challenge, dispute, avoid, or in any way prevent the enforcement by Lender of its claims, liens or realization upon the Lender's Collateral.

35. The Stipulation provides a Fee Challenge Reservation in favor of the Debtors allowing them to challenge certain fees they believe are inappropriate and unenforceable under the circumstances of this case. In addition, the Stipulation provides that any Official Committee of Unsecured Creditors that is appointed by the U.S. Trustee's office will have a period of thirty (30) days from the Petition Date to bring any adversary action, suit, arbitration, proceeding or other litigation of any type relating to or in connection with a challenge to the claims of the Credit Agreement regarding but not limited to the validity, perfection, priority or enforceability of any of

Lender's liens securing its claims. The order, to be entered, will further provide after the thirtieth (30th) day no further such challenges can be brought unless extended by the agreement of Lender.

36. The Debtors also request that the Court grant the Debtors authority to pay to the Lender the $75,000.00 required as the financing fee upon approval of the Stipulation.

### E. CONCLUSION

37. Debtors have determined, in their business judgment, that obtaining post-petition financing pursuant to the Stipulation is necessary for them to continue in business and that in the absence of such financing, there is a severe risk that their operations will cease, the sale to AHI or another bidder lost, and the value returned to stakeholders greatly diminished. Despite diligent efforts, Debtors are unable to obtain on an expedited basis other sources of credit to allow them to continue their operations post-petition without a cash infusion. Debtors have concluded that the DIP Loan, which the Lender is willing to provide, is the only reasonable credit, secured or unsecured, available to Debtors.

### F. REQUEST FOR INTERIM RELIEF AND MOTION FOR EXPEDITED HEARING

38. An immediate need exists for the Debtors to obtain approval of the Stipulation in order to obtain post-petition credit to pay payroll, rent, utilities, and pay other ongoing expenses in the ordinary course of business, as identified on the ten (10) week budget attached hereto as Exhibit "C". Without the immediate use of the proceeds post-petition financing under the Stipulation, the Debtor's ability to operate their businesses will be severely impaired. It is imperative that an interim hearing on this matter be held as soon as possible and the Debtors have requested it be held on August 25, 2010, or as soon thereafter the Court will allow.

39. The Lender by the Stipulation has consented to the use of cash collateral during the period between the Petition Date and interim hearing subject to the terms of the Budget and Stipulation.

40. Pursuant to Fed.R.Bankr.P. 4001(c)(2), Debtors request that the Court set a interim hearing on the approval of the Stipulation and that at such interim hearing, the Court authorize the temporary extension of post-petition secured credit under the Stipulation. Prior to a final hearing, the Debtors' use of the proceeds from the DIP Facility under the Stipulation shall be consistent with the ten (10) week budget in order to avoid immediate and irreparable harm to these bankruptcy's estate pending a final hearing. Debtors request that the Court also set a final hearing for the approval of the Stipulation and Post-Petition Financing at the earliest possible date.

## **NOTICE**

41. Notice of this Motion is being sent by federal express, to those parties listed on the Certificate of Service attached hereto which includes Lender, the Debtors' twenty largest unsecured creditors, the United States Trustee, the IRS, the Nebraska Department of Revenue, and those creditors requesting notice pursuant to Fed.R.Bankr.P. 2002. Once a interim hearing is set, Debtors shall send, by the same means, a notice of the hearing to those parties and entities set forth above. The Debtors submit no further notice should be required.

WHEREFORE, Debtors request that this Court enter an order:

(1) Setting an expedited interim hearing date for the temporary, interim approval of the DIP Facility on August 25, 2010 or as soon thereafter as the Court allows;

(2) Setting a time and date for a final hearing on the approval of the DIP Loan;

(3) Approving the entering into the Stipulation under the terms and conditions set forth therein; and

(4) Granting such other and further relief as may be just and proper.

Dated this 20th day of August, 2010.

Respectfully submitted,

**PROFESSIONAL VETERINARY PRODUCTS, LTD, A Nebraska Corporation, EXACT LOGISTICS, LLC, a Nebraska limited liability company and PROCONN, LLC, a Nebraska limited liability company**, Debtors

By: /s/ *Robert J. Bothe*
Robert J. Bothe, #15018
James J. Niemeier, #18838
Michael T. Eversden, #21941
Robert P. Diederich, #23393
McGrath North Mullin & Kratz, PC LLO
Suite 3700, First National Tower
1601 Dodge Street
Omaha, Nebraska 68102-1627
Telephone: 402-341-3070
Facsimile: (402) 341-0216

**ATTORNEYS FOR DEBTORS**

# CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2010, I caused filing of the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system, and further certify that on the same date I mailed by Federal Express Overnight delivery, this document to each of the individuals listed below:

Wells Fargo, National Association
C/O Christopher J. Fisher
Laurence M. Frazen
Trevor A. Jenkins
Bryan Cave LLP
1200 Main Street, Suite 3500
Kansas City, MO 64105

Nebraska Department of Revenue
Attn: Bankruptcy Unit
301 Centennial Mall South
Lincoln, NE 68509-4818

Internal Revenue Service
Fresno, CA 93888-0002

United States Trustee's Office
111 South 18th Plaza
Suite 1148
Omaha, NE 68102

Agri Laboratories Ltd
20927 State Route K
St Joseph, MO 64505-3570

Bayer Healthcare LLC
12809 Shawnee Mission Pkwy
Shawnee KS 66216-1846

Bimeda Animal Health Inc
Attn: Marianne Anderson
One Tower Lane Suite 2250
Oakbrook Terrace, IL 60181

Boehringer Ingelheim
Vetmedica
2621 N Belt Highway
St. Joseph, MO 64506-2002

Idexx Distribution Corporation
One IDEXX Drive
Westbrook, ME 04092

Intervet, Inc. / Schering Plough
556 Morris Ave
Summit, NJ 07901-1330

Jorgensen Laboratories Inc
Attn: Cindy Alexander
1450 N Van Buren Ave
Loveland, CO 80538

Kendall/Covidien
15 Hampshire St
Mansfield, MA 02048

Central Life Sciences / Vet Product
Laboratories
1501 E. Woodfield Rd Suite 200W
Schaumburg, IL 60173

Lionel Reilly
20620 Corral Road
Elkhorn, NE 68022

| | |
|---|---|
| Merial Limited<br>115 Trans Tech Drive<br>Athens, GA 30601 | Neogen Corporation<br>Attn: Greg Hardin<br>25154 Network Place<br>Chicago, IL 60673 |
| Norbrook Labs<br>9733 Loiret Blvd<br>Lenexa, KS 66219 | Novartis Animal Health US Inc<br>10401 Highway 6<br>Lincoln, NE 68517 |
| Nutra-Blend LLC<br>3200 2nd Street<br>Neosho, MO 64850-7738 | Pfizer, Inc.<br>812 Springdale Drive<br>Exton, PA 19341 |
| Ceva Animal Health, Inc.<br>465 Sovereign Ct.<br>St. Louis, MO 63011 | Top Rx Inc<br>2950 Brother Boulevard<br>Memphis, TN 38133-3968 |
| Virbac Corp<br>3200 Meacham Boulevard<br>Fort Worth, TX 76137-4611 | West-Ward Pharmaceutical Corp<br>3030 Lyndon B Johnson Freeway<br>Dallas, TX 75234-7781 |

    /s/ *Robert J. Bothe*_____
Robert J. Bothe